REEVES v. ANDERSON.  (No. 9159.)

(Court of Civil Appeals of Texas. Ft. Worth.
Nov. 8, 1919. On Motion for Rehear-
ing, Jan. 10, 1920.)

1. EVIDENCE ⬉443(1)—PAROL EVIDENCE AD-
MISSIBLE TO SHOW UNDERTAKING COLLAT-
ERAL TO NOTE.

Where A. made note payable to R., A. to
become the apparent owner of corporate stock
which R. was to pay for by discounting the
note, R. to be the real owner of the stock and
to repay the note and hold A. harmless, parol
evidence was admissible to show the oral agree-
ment of ·R. to hold A. harmless; such agree-
ment being collateral to and forming no part of
A.'s contract with the corporation.

2. INDEMNITY ⬉15(7)—EVIDENCE SUFFICIENT
TO SUPPORT FINDING OF AGREEMENT TO DIS-
CHARGE NOTE.

In a proceeding wherein one against whom
judgment was had on a note executed by him
sought to recover the amount of the judgment
from a third person, who had agreed to dis-
charge the note and to purchase stock for which
the note was given, evidence held sufficient to
sustain a finding that there was an agreement
to purchase the stock and to discharge the note
executed therefor.

Appeal from District Court, Tarrant Coun-
ty; Ben. M. Terrell, Judge.

Suit by the First National Bank of La
Grange against A. J. Anderson, in which de-
fendant filed a plea over against William
Reeves. From an adverse judgment in favor
of defendant, the cross-defendant appeals.
Affirmed.

Bryan, Stone & Wade, of Ft. Worth, for ap-
pellant.

Chas. T. Rowland and. Slay, Simon &
Smith, all of Ft. Worth, for appellee.

DUNKLIN, J. This is the second appeal
so far as relates to the issues between appel-
lant, Reeves, and appellee, Anderson; our
disposition of the former appeal appearing in
191 S. W. 836.

As shown in our opinion on the former ap-
peal, this suit was instituted by the First Na-
tional .Bank of La Grange against A. J. An-
derson upon a promissory note executed by
Anderson, payable to William Reeves, or or-
der, and acquired by the bank before·maturi-
ty for a valuable consideration, without no-
tice of any defense thereto. Anderson·filed a
plea over against Reeves, in which he prayed
for judgment against Reeves for any recov-
ery awarded to the bank, the plea over being
predicated upon an alleged contract of
Reeves to indemnify Anderson for any loss
he might sustain by reason of the execution
of the note in controversy. On the former
appeal, the judgment in favor of the plain-
tiff bank against Anderson was left undis-
turbed, but the judgment rendered on the
first trial, denying Anderson a recovery over
against Reeves, was reversed, and the cause
remanded for another trial of the issues pre-
sented by Anderson's cross-action. On the
second trial, from which the present appeal
was prosecuted, Anderson recovered a judg-
ment against Reeves on his cross-action,
from which Reeves has prosecuted his ap-
peal.

After the reversal of the former judgment
in favor of Reeves, Anderson filed an amend-
ed plea over, but the issues presented by that
amendment were substantially the same as
presented in his original plea, which this
court held good as against the general de-
murrer, which was sustained on the first
trial. We shall not attempt to set out the
amended plea in hæc verba. Briefly `stated, ·
the amended plea was substantially to the
effect that Reeves undertook to organize and
incorporate, under the laws of Texas, a bank
and trust company, under the name of the
First State Bank & Trust Company of Ft.
Worth, Tex., and induced Anderson to sub-
scribe for $5,000 of the capital stock in the
proposed corporation and to execute the note
in controversy in favor of Reeves with the
understanding and agreement that Reeves
would negotiate the note and turn over to the
corporation the proceeds thereof in payment
of the stock so subscribed by Anderson, which
stock, when issued, would be held by Reeves,
and should become his property whenever he
(Reeves) should himself pay off the note
which he agreed with Anderson to do. In
other words, according to allegations in the
plea, Reeves contracted and agreed with An-
derson that if the latter would subscribe for
the stock and execute the note, he (Reeves)
would indemnify and hold him harmless
against any liability on the note, and in con-
sideration of that contract Anderson sub-
scribed for the stock and executed the note
merely as an accommodation to Reeves, and
for no other purpose as between him and
Reeves than to assist Reeves to consummate
his plan to secure a charter for the proposed
corporation. But it was further alleged that
it was agreed and understood between Ander-
son and Reeves that Anderson was to become
a shareholder in the corporation in good faith
as to all other persons and to sustain his
proper and legal relation as such a sharehold-
er, as fixed by the laws of the state. Accord-
ing to further allegations in the plea, Reeves
did negotiate the note for $5,000, and applied
the proceeds in payment for the stock, the
possession of which he retained under and by
virtue of the agreement for him so to do, and
from time to time procured renewals of the
original note, all of which Anderson executed
in full reliance upon the original promise of
Reeves, reiterated on the occasion of each re-
newal.

⬉For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

By another count in the plea, it was alleged that later Reeves purchased from Anderson and all other stockholders than himself all the capital stock of the corporation not then owned by him, and, in order to liquidate the business of the company and as a part of the consideration for said purchase, contracted and agreed with the holders of said stock so purchased to pay off and discharge all the outstanding liabilities of the corporation and all the liabilities of such shareholders existing by reason of their subscriptions for the capital stock so purchased, said assumption including the payment of the $5,000 note in controversy.

The case was tried before a jury upon special issues, which, together with the findings of the jury, are as follows:

"Question No. 1: When A. J. Anderson subscribed for the shares of stock in the First State Bank & Trust Company and executed therefor his note, did William Reeves agree to hold said Anderson harmless by reason of the execution of said note? Answer Yes or No. Answer: Yes.

"Question No. 2: When A. J. Anderson subscribed for the shares of stock in the First State Bank & Trust Company and executed therefor his note, did William Reeves agree with A. J. Anderson that he, the said Reeves, would take care of said note or pay off the same when it matured, or pay off the same whenever requested by said Anderson so to do? Answer Yes or No. Answer: Yes.

"Question No. 3: Did William Reeves, on or about the ‪——‬ day of ‪——‬, 1910, or after the time the First State Bank & Trust Company decided to liquidate, agree to purchase the A. J. Anderson stock, and discharge the note executed therefor. Answer Yes or No. Answer: Yes."

Upon the trial, all the material allegations in the first count of Anderson's plea over were sustained by the testimony of himself and corroborated by that of his two witnesses, A. G. Ilseng and J. W. Ripy. According to Anderson's testimony, the agreement on the part of Reeves was to pay the note himself and to hold Anderson harmless against liability thereon, and that Reeves should hold possession of the stock, and as between Anderson and Reeves the latter should be the real owner of the stock.

[1] By different assignments of error, appellant insists that such testimony was inadmissible because it contradicted and varied the terms of the note. We are of the opinion that there is no merit in those assignments since the same related to an agreement and contract which was collateral to and formed no part of Anderson's contract with the corporation to pay $5,000 for the stock he subscribed. Anderson did not seek to avoid his contract to pay the note to the bank, nor was this a suit by the corporation to hold Anderson liable on his subscription contract for stock. The only purpose of Anderson's suit was to recover upon Reeves' separate and col-

lateral agreement to indemnify him against loss by reason of the execution of the note, and the rule of evidence invoked by appellant could have no application to proof offered to support that contract of indemnity. The rule that excludes parol evidence when offered to contradict or vary the terms of a written instrument has no application to collateral undertakings in which the written instrument was executed in part performance of an entire oral agreement. Stuart v. Meyer, 196 S. W. 615, and authorities there cited.

By another assignment, it is insisted that the alleged contract between Anderson and Reeves was against public policy, because it was contrary to the statutes of the state governing the organization of state banks, and was a fraud upon future depositors of the bank, and was therefore void. This question was fully discussed in the opinion rendered on the former appeal, and for the reasons there given and upon authorities there cited the assignment is overruled.

The further contention to the effect that the contract of Reeves was void and unenforceable because unilateral was likewise disposed of in our former opinion adversely to appellant, and we adhere to that ruling now.

[2] Appellant insists that there was no evidence to support a finding that in the year 1910, after the First State Bank & Trust Company decided to liquidate, defendant, Reeves, agreed to purchase the A. J. Anderson stock and to discharge the note executed therefor, and that therefore the court erred in submitting that issue to the jury over appellant's objection made thereto.

Anderson testified that at a meeting held by the stockholders, in which it was decided that the corporation should go into liquidation, Reeves, who then owned 85 per cent. of the capital stock, agreed with the stockholders to take over their stock, including Anderson's stock and all assets of the corporation. He further testified that at that meeting Reeves stated that a suit had been threatened by some of the stockholders for the purpose of putting the assets of the bank into the hands of a receiver, and the taking over of all the stock and assets of the corporation by Reeves was designed for the purpose of enabling Reeves to avoid a receivership. He further testified that at the time all the bank's liabilities had been paid off and discharged; and, in connection with his testimony relative to the negotiations which led up to the final agreement of Reeves to take over the stock, he further testified as follows:

"I said, 'Mr. Reeves, in this connection, let me recall now our agreement; you know I have nothing to show for this stock, and you know I have never seen the stock; never laid my hands on it, never have owned it; and now,' I said, 'I want you to be as good as your word; I want you to hold me harmless in every way, since it

has come to this.' I said, 'You remember your solemn promise?' He said, 'Yes; I remember it; you will be taken care of all right.' That was his answer to me at that time."

The testimony of witness Ripy tended to corroborate the testimony of Anderson, above quoted, although it was not so specific. In view of this evidence, we feel unable to sustain the assignment now under discussion.

The evidence further shows without controversy that the judgment recovered by the bank against Anderson upon the first trial has since been paid off in full by Anderson.

For the reasons indicated, the judgment from which this appeal is prosecuted is affirmed.

### On Motion for Rehearing.

Appellant urgently insists that we erred upon original hearing in holding that there was evidence sufficient to support the finding that in the year 1910, after the First State Bank & Trust Company decided to liquidate, defendant Reeves agreed to purchase the A. J. Anderson stock and to discharge the note executed therefor. It is insisted that the testimony of Anderson, quoted in our opinion in discussing the question, was only evidence which remotely tends to sustain the finding, and that such testimony was itself insufficient, in that it amounted to no more than a mere reminder of the alleged former agreement of Reeves that the stock subscribed for by Anderson should be held as the property of Reeves, who would pay therefor. In addition to that testimony, Anderson further testified as follows:

"I would like to make a statement in regard to my attitude on this question of buying out the other stockholders at the time this Capps reccivership business came up, and in the conversation that occurred between the three of us there, Mr. Reeves, Mr. Ripy, and myself. It may be hard for the jury to understand this. This is exactly the way it happened, as nearly as my recollection serves me. That young lady that was in the office, the bookkeeper, Miss Fillinger, phoned me to come up there. I went up to the office, and when I got there I met Mr. Ripy at the office; they had telephoned him to come up; we had a little meeting there just prior to the meeting that we had with Capps and Hawes and that bunch. We were discussing that fee. Mr. Reeves said he would never, never in the world, pay such a fee as that. I told him I thought it was a holdup, too; absolutely a holdup fee. We then went a little further, discussing the matter, and finally we in that little meeting voted for Mr. Reeves finally to take over all the stock, buy out all the rest of the stockholders, because he at that time owned, if my recollection serves me correctly, 86 per cent. of the stock, 84 to 86 per cent., already owned by him; and, rather than to have Capps tie it all up in a lawsuit, and probably put the bank's assets in the hands of a receiver, where the expense would eat it up, I advised him that it would be better for him to take it all over. He said, 'Well, wait until we meet this now, and we will go after that a little farther.' So we got into that next meeting right away, a few minutes thereafter, and that discussion came up, and Capps was very positive that he would not take a 5-cent piece less than the $5,000 for his service, and if we did not pay that he threatened right then and there to put the bank's assets in the hands of a receiver, so it was up to Mr. Reeves to do something, and we asked Mr. Reeves if he would not then formally promise to buy the stock of the bank, and he said, yes, he would do that in order to get rid of Capps, and he said he would do that and allow Capps his $5,000 fee, and we all voted for that measure."

The witness Ripy testified to the same meeting referred to in Anderson's testimony last quoted, and testified substantially to the same effect as did Anderson with reference to what occurred at that meeting.

The motion for rehearing is overruled.