**H. O. KILSBY, Appellant,**

v.

**AERO–TEST EQUIPMENT CO., Inc.,**
**Appellee.**

**No. 15212.**

Court of Civil Appeals of Texas.

Dallas.

March 8, 1957.

Rehearing Denied April 12, 1957.

**704**

Wm. Andress, Jr., Dallas, for appellant.

Golden, Croley, Howell, Johnson & Mizell, and John L. Roach, Dallas, for appellee.

YOUNG, Justice.

█ By this suit plaintiff Kilsby seeks to recover as compensation for having been one of three signers of an indemnity agreement of August 4, 1952, a one-third of 40% of the net profits of two projects undertaken by defendant Company, and based on alleged corporate action to such effect. Upon trial to the court and a take nothing judgment, Kilsby then moved for findings of fact and conclusions of law which were filed, he making general and special objections thereto along with request for additional findings. The latter motion being denied, a statutory statement of facts was filed and becomes controlling of this appeal. Swanson v. Swanson, 148 Tex. 600, 228 S.W.2d 156. In consequence, only incidental reference will be hereafter made to these court findings.

By first amended petition it was alleged that on August 4, 1952 plaintiff, for benefit of defendant, along with K. E. Soder and T. W. Howard, Jr., had executed a certain standard form General Contract of Indemnity in favor of the National Fire Insurance Company, a member of the National of Hartford Group, thereby holding said indemnitee harmless as a result of writing certain bid and performance bonds, which bonds were necessary for defendant to furnish as a condition precedent to its obtaining the following valuable contracts: "(a) Air Force Contract No. AF33(600)20709, calling for 35 generator test stands for Wright Field, Ohio, at a contract price of $402,451.81. (b) Ford Motor Company, Aircraft Engine Division, contract No. 267–1–53, calling for six engineering cells at a contract price of $351,454.00." He further alleged that on basis of said August contract of indemnity, performance bonds were executed on above two jobs by the Insurance Company, plaintiff obligating himself for a potential liability in total amount specified in these projects.

That prior thereto on or about June 12, 1952, at a joint meeting of stockholders and Directors of defendant, a resolution had been adopted whereby stockholders of the Company were given the opportunity to participate in making bonds required by the corporation in excess of its bonding capacity and to pay 40% of the net profits arising from specific jobs as compensation for participation in the making of such bonds; that above described projects had been completed, resulting in estimated net profit to defendant of approximately $100,000. That thereafter the co-indemnitors Howard and Soder had been paid their portion of the profits so realized by the Corporation but that the latter had refused to pay plaintiff anything, to his damage in the sum of $13,-333.33; praying for an accounting by defendant as to the true profits accruing from the two successful bids, judgment for his portion thereof, interest, costs, etc.

Though undisputed in considerable part, the salient facts underlying this controversy must next be stated. Aero-Test Equipment Company was incorporated March 24, 1952 with capital stock of $50,000, consisting of 500 shares of stock, one-half paid in, with full payment of balance to the corporation between August 1 and 10, same year. Its purpose was the designing, development and manufacture of test equipment for aircraft and accessories. By-laws of the corporation called for a management of ten Directors. Kilsby had initially subscribed for and been issued Fifty shares of said stock and served as Company Director until December 1952. In course of business defendant was frequently required to provide bonds in securing of bids or for performance of contracts awarded; which bonding was often provided by Surety Companies with prerequisite of indemnities for the surety bonds required. In this connection on June 12, 1952 a joint meeting of stockholders and Directors of the corporation was held; and among other things the following action was taken:

"Resolved, that when additional bonding requirements of the corporation are needed, that the officers should

seek outside bonding indemnity and that for same the corporation agree to pay not to exceed 40% of the net profit on the specific job.

"Resolved, that if the bonding requirements should exceed the corporate bonding capacity, all of the stockholders should be notified and given the first opportunity to participate equally in making the bond required; second, if acceptable to a bonding company such a bond could be made on a prorated basis in accordance with the individual shareholders; third, if sufficient bonding capacity could not be secured in either of these two manners, the management of the corporation is authorized to obtain bonding indemnitors outside the corporation."

Kilsby had been employed by Aero-Test during 1952 on prior projects for the U. S. Navy at Daingerfield, Texas; his Company connection terminating at end of that year, inclusive of stock interest. He was also operating on his own under name of Trinity Engineer Builders and in June 1952 had participated with defendant as a joint venture in bidding for a Navy Office Building contract at Daingerfield on basis of 50–50 interest in profits if secured, the two concerns furnishing a bid bond only. However, the contract for this Daingerfield job was never awarded by the Government. Also in June 1952, Kilsby, Howard and Soder had executed a like general contract with the National of Hartford Group indemnifying the Insurance Company for all bonds executed by it on behalf of Aero-Test, with the following recital opposite their names: "This indemnity agreement is signed subject to the understanding that the agreement will be released when the $25,-000.00 balance on stock subscribed has been deposited in a Dallas bank." Defendant Company did not sign such prior indemnity contract or that of August 4 on which plaintiff's suit is based; and at this point notice should be taken of record testimony to effect that said August 4 contract was also thus limited as between these signers (Howard, Soder and plaintiff); and of further testimony that, as between themselves, said two indemnities would apply only to the joint venture bidding for the U. S. Navy Office Building at Daingerfield. Undisputedly, neither defendant Company nor any of its officers had specifically agreed to compensate plaintiff for signing the dated indemnity contracts, he relying solely on the corporate resolution of June 12, as an agreement by appellee to pay him for executing the indemnity contract of August 4, 1952.

The projects described in plaintiff's pleading on which claim is made for a one-third interest in net profits were otherwise known as E–M–2, Wright Field Job, and E–M–6, Ford Motor Company. The former job was bid on prior to execution of either of above indemnity contracts (June 11 and August 4, 1952), no bid bond required, and awarded September 12, 1952. This job had not been completed on date of trial (April, 1956), no exact amount of profits determined, but estimated by President Howard at $20,000. The Ford Company job was bid in December 1952, no bid bond required, and awarded to defendant; the Insurance Company thereafter executing performance bond in its behalf. This project was completed with profits estimated at $61,123.18; and pursuant to said determination of profits, the Executive Committee of Defendant Board of Directors, as authorized by its By-laws, met on December 10, 1953, taking the following action: "The indemnitors of the Ford Motor Job (E–M–6) shall be paid a maximum of 16 per cent of the net profit of $61,123.18." This rate of compensation was reduced by Messrs. Howard and Soder to 12% of $60,000, or $7,500; and paid to Howard, Soder and John Damiani on a 50–30–20 basis as determined by the financial statement of each of these indemnitors.

In meantime Kilsby had written to Howard, February 3, 1953, complaining that his bonding capacity had been impaired by reason of the August 4, 1952 indemnity contract, requesting photostats of certain writings; in March 1953, writing to the bond-

ing company (National of Hartford Group), giving notice of his desire to be released from obligations of said general contract of indemnity, and release as to him became effective on March 10, 1953. Here may be noted record evidence to effect that, relative to the Ford Motor Company Job, the bonding company had refused to accept the indemnity contract signed by plaintiff; having requested additional signatories which were supplied by Howard, Soder and Damiani subsequent to March 10, 1953. Also that pursuant to Rule 169, Texas Rules of Civil Procedure, plaintiff's request for admissions of fact during course of this proceeding was not answered by defendant; the following thereby becoming judicial admissions at the trial:

"(1) The general contract of indemnity executed by K. E. Soder, T. W. Howard, Jr., and H. O. Kilsby, acknowledged 4 August 1952, copy of which has heretofore been furnished to defendant and is identified as Plaintiff's Exhibit 2 attached to the deposition heretofore taken of T. W. Howard, Jr., was never terminated by any of the signers thereof, by written notice by registered mail as provided in the 11th paragraph thereof prior to such registered notice given by H. O. Kilsby to National Fire Insurance Company dated 10 February 1953. (2) Prior to the termination of the general contract of indemnity described in paragraph 1 hereof, National Fire Insurance Company of Hartford had executed bonds on behalf of Aero-Test Equipment Company, Inc., upon the following two contracts:

(Wright Field and Ford Motor Jobs) * * * (3) National Fire Insurance Company of Hartford, Connecticut, has construed the general contract of indemnity described in paragraph 1 hereof as indemnifying that company for all liability by reason of the bonds issued on the two contracts described in paragraph 2 hereof. (4) National Fire Insurance Company of Hartford, Connecticut, has refused to terminate the liability of H. O. Kilsby upon the general contract of indemnity described in paragraph 1 hereof until it is relieved of all liability on the bonds given in connection with the contracts described in paragraph 2 hereof."

From above admissions it is evident that the bonding company has construed plaintiff's indemnity contract of August 4, 1952 as part security for its performance bonds on the two projects totaling approximately $750,000; same having been furnished prior to Kilsby's formal release from liability on March 10, 1953. Here it is the position of appellant that defendant's resolution of June 12, 1952 authorizing compensation to indemnitors up to 40% of net profits on contracts obtained by the corporation, constituted an offer, and his signing of the indemnity agreement an acceptance, thus completing the contract sued upon. Appellee on the other hand alleged an understanding between plaintiff, defendant and co-indemnitors Howard and Soder that both indemnity agreements were signed with relation to the joint venture bid on the Daingerfield Office Building project which was not awarded. Howard, President of Aero-Test, so testified in answer to questions by the Court.[1]

1. Judge Thornton to Howard: "Will you tell the court why you feel like you don't owe Mr. Kilsby any money—I mean, the corporation? A. The only purpose of the indemnities Mr. Kilsby signed were for forming this Trinity Engineer Builders Corporation which we had talked about, to get that corporation going; we were bidding the Daingerfield office building job which Mr. Kilsby prepared the estimates on. He needed a bond and he didn't have what it took to make it on his own; he got on this bond so that Aero-Test stockholders would feel that he was behind the venture so that we wouldn't be subject to too much criticism by Aero-Test—it was a Trinity Engineer Builders-Aero-Test joint venture. Trinity Engineer Builders had no money for financing or bonding; so, to satisfy the Aero-Test stockholders he thought he should be on the bond. I did not ask

■■ We will first consider the validity or such a collateral agreement between Howard, Soder, Kilsby and defendant Company; appellant arguing inadmissibility of all evidence thereof as violative of the parol evidence rule which denies "efficacy to any prior or contemporary expressions of the parties relating to the *same subject-matter as that to which the written memorial relates.*" (Emphasis ours.) McCormick and Ray, Evidence, First Ed., p. 947; 17 Tex. Jur., p. 793. Obviously this familiar rule would be wholly effective concerning any attempt to vary the August 4 indemnity contract as between all contracting parties, i. e., Howard, Soder and Kilsby on the one hand and *indemnitee National of Hartford Group* on the other. But the challenged evidence relates to the parol agreement, not between indemnitors and the bonding company, but between said obligors inter se and appellee, which was not a party to the August 4 contract of indemnity. Such an understanding between the three and the evidence thereof has no effect on the agreement of each of the indemnitors with the bonding company —merely determinative of rights among themselves and appellee. Preston v. Breedlove, 36 Tex. 96; McCormick and Ray, supra, pp. 979, 980. Defendant not being a party thereto, parol evidence is admissible of any agreement Howard, Soder and Kilsby may have had with it concerning execution of the indemnity in its behalf. Johnson v. Portwood, 89 Tex. 235, 34 S.W. 596; McCormick and Ray, p. 977. Clearly applicable to the situation at hand are those

decisions holding that parol evidence is admissible to show relationship as between comakers or endorsers on a promissory note; that while liability of each to the payee is determined by the instrument, nevertheless as between themselves parol evidence is admissible to show that one is surety for the other. 17 Tex.Jur., p. 876; Clevenger v. Commercial Guaranty State Bank, Tex.Civ.App., 183 S.W. 65; or as in Reeves v. Anderson, Tex.Civ.App., 217 S.W. 745, the court holding parol evidence admissible, since it related to an agreement or contract collateral to the note and forming no part of Anderson's contract with the corporation to pay for the stock or his liability to the Bank. Having validity, therefore, this corollary agreement between indemnitors would preclude Kilsby from claiming any part of the net profits arising from completion of the two named projects; appellant admitting that he was not otherwise promised compensation for these indemnity agreements. It would thus appear that Court findings 9, 10, 13, 14 and 22 have support in record testimony.

But if we be mistaken in the conclusions above reached, the question is posed of just what compensation may have accrued to appellant under defendant's corporate resolution of June 12, 1952, followed by his signed indemnity contract of August 4, 1952 involving potential liability to the bonding company as hereinabove indicated; appellee contending that under the resolution on which Kilsby relies, net corporate profits were to be calculated on the financial ca-

---

him to get on the indemnity—on the bond, I mean—I did not ask him to get on it. That is the reason I don't feel that Aero-Test owes him anything. The whole purpose of that indemnity was for the Daingerfield office building job which maybe has nothing to do with this case, but it was the only reason for that indemnity agreement."

As already mentioned, Kilsby had a 50% interest as joint adventurer in the proposed project at Daingerfield. His further testimony on cross-examination evidences the close relationship of that project to the August 4 indemnity:

"Q. Mr. Kilsby, at the time you executed this agreement of August 4, 1952, I believe your testimony is * * * that you were asked to do that? A. Yes.

"Q. It wasn't your idea? A. It was not my idea.

"Q. Did you express any objection? A. No, I didn't. I was part of Aero-Test; I was willing to help them.

"Q. You were perfectly willing— A. I was willing to help them.

"Q. And you did have a fifty per cent interest in the whole deal on your own? A. That is all I was interested in.

"Q. Sir? A. That was all I was interested in.

"Q. Was your fifty per cent of the deal? A. That is right."

pacity of each indemnitor; that under the record (inclusive of his financial statement) he was shown to possess little or no bonding ability and entitled to no more than nominal compensation. These and other kindred matters will be discussed briefly.

■■ (1) Appellant's claim that appellee was to pay 40% for this bonding is based principally on the August 27 letter of Secretary Soder whose construction of aforesaid resolution cannot prevail over plain terms of the June 1952 resolution to pay "not to exceed" 40% of net profits for bonding. (2) The resolution in question by its terms was not an offer, but merely an authorization for officers of the corporation to seek and obtain outside bonding indemnity and to pay not to exceed 40%, etc.; requiring further corporate action, as appellee correctly observes, before ripening into an offer. The Executive Board Meeting of December 10, 1953, therefore, became of controlling effect; its fixing of 16% as compensation for the particular bonding being fully authorized and binding on all indemnitors, to be prorated "in accordance with the individual capacity * * * of the individual shareholders * * *." Questions of fact are implicit in the foregoing resume of appellant's cause of action in event of reversal and remand for another trial; it being our conclusion that at this juncture his suit for accounting and claim for compensation as to the Wright Field project is premature.

■ Lastly, in our opinion the trial court's findings 16 through 20 and conclusion of law in accordance that "No effective action was taken by the Board of Directors of defendant company at such purported meeting of June 12, 1952, authorizing payment of any sums for the execution of the indemnity agreements described in items 2 and 8, above", are not warranted by the record. The claim of invalidity of Board Meeting is evidently on ground that (a) the corporate stockholders and Directors had acted jointly, and (b) a majority of the Directors was not present, even though the

minutes recited a quorum. Defendant had pled the resolution as authorizing payment to indemnitors up to 40% of the profits for bonding and financing; had raised no objection to its introduction in evidence as plaintiff's Exhibit No. 1; also in a special meeting of stockholders and Directors on December 12, 1952, minutes of the prior June 12 meeting had been read and approved. Appellee would therefore appear in no position to complain of gross irregularities of Board Meeting, if any; the record incidentally bearing out a comment by attorney for appellant that "The Court itself had raised, labored and determined the matter." His point 5 in such connection is accordingly sustained, that "Neither the appellee corporation nor a participating stockholder can urge the invalidity of the corporate action of June 1952, upon which other participants, including appellant, have acted." See also 64 A.L.R., Annotations, pp. 712–724; 13 Am.Jur., pp. 927–928.

Appellee strongly argues that the 50–30–20 division of profits between indemnitors other than Kilsby was due to the bonding company's requirement of a new contract of indemnity signed by Howard, Soder and Damiani *after* March 10, 1953. Consistent with above quoted judicial admissions that the bonding company had executed its performance bond on the Ford Motor Job *prior* to March 10, 1953, we must view this after-acquired agreement of indemnity as simply by way of additional security.

However, on grounds earlier discussed in this opinion concerning the existence of a corollary agreement between appellant and appellee, and as reflected in court findings 9, 10, 13, 14 and 22, the judgment under review is in all respects affirmed.

### On Rehearing.

■ ■ Under appellant's citation of cases, e.g., Tolbert v. Standard Accident Ins. Co., Tex.Civ.App., 218 S.W.2d 488, reversed on other grounds, Tex., 223 S.W.2d 617, defendant, although not actually sign-

**710**

ing the two indemnity contracts, was bound thereby as a third-party beneficiary. The parol evidence rule was therefore applicable to an oral understanding between Howard, Soder and plaintiff that, as between themselves and defendant Company, such instrument would be limited to the Daingerfield job; and properly excluded by the trial court upon objection. In support of defendant's judgment, however, we again point to plaintiff's own admission that he was promised nothing in connection with signing the indemnities in question; executing them in furtherance of the interest of his own project, Trinity Engineer Builders. Thereby eliminated, at least by inference, was any reliance upon the corporate resolution of June 12, 1952.

The original opinion is corrected as hereinabove indicated. Otherwise the motion for rehearing is overruled.